IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEONETTI'S FROZEN FOODS, INC. | : | C.A. NO. 15-4169 |
| Plaintiff | : | |
| v. | : | |
| CREW, INC. d/b/a REW MARKETING, INC. | : | |
| Defendant | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                 **September 30, 2015**

Many have suffered embarrassment from the all-too-familiar issue in business emails of hitting "reply-all" to an email including comments not intended to be read by everyone on the email chain. The substantive legal issue here is the effect of an errant "reply-all" email which allegedly causes an unintended recipient/potential customer to stop working towards a business relationship with Plaintiff. We will not decide the substantive issues as both the defendant sender and third party unintended recipient/potential customer are located in Bentonville, Arkansas and venue more properly resides in the Western District of Arkansas.

The Southwest Philadelphia Plaintiff asked Defendant business broker in Bentonville, Arkansas to help it place its custom stromboli products in Sam's Club also headquartered in Bentonville. Plaintiff's claims arise from the Arkansas Defendant's agent sending a "reply-all" email with a copy to Sam's Club's agents in Arkansas suggesting Plaintiff may be selling stromboli to Sam's Club's lead competitor Costco. Sam's Club officials in Arkansas thereafter decided, for reasons presently unknown, to stop any further testing of Plaintiff's stromboli for placement in its stores. As this dispute arises from conduct involving decisions made by a third

party Arkansas citizen based on an email representation made by another Arkansas citizen, we transfer venue to the Western District of Arkansas where all of the witnesses reside and the district court may exercise personal jurisdiction over all of Plaintiff's claims.

## I. FACTS

Philadelphia Plaintiff Leonetti's Frozen Foods Inc. ("Leonetti") develops frozen food products for sale to businesses under a private label and to consumers under its own label. (First Amended Complaint, ECF Doc. No. 8, ¶ 13). Defendant CREW Marketing INC. ("CREW") of Bentonville, Arkansas is a marketing services broker located near Walmart headquarters providing programs for the advertising, solicitation and marketing of products to club-format stores such as Sam's Club owned by Walmart.[1] (*Id.* at ¶¶ 6, 21.)

In August 2014, Leonetti director Robert Ippaso met with a senior vice-president of Sam's Club. (*Id.* at ¶ 14.) Ippaso and Sam's Club discussed developing a custom, ready-to-eat stromboli product for sale at Sam's Club's cafés ("Café Stromboli"). (*Id.* at ¶ 15.) Leonetti proposed designing and testing the stromboli specifically for sale at Café Strombolis. (*Id.* at ¶ 16.) Leonetti offered its own brand of frozen stromboli products ("Leonetti Frozen Stromboli") for sale in Sam's Club's freezer section. (*Id.* at ¶ 17.)

Leonetti then asked CREW for help in pursuing Sam's Club. (*Id.* at ¶ 20.) CREW already represented Leonetti with Costco warehouse stores since January 2014. (*Id.* at ¶¶ 22-23.) Leonetti and CREW limited their relationship to the Costco account and allowed additional accounts only if agreed in writing. (*Id.* at ¶¶ 25-26.) As part of this on-going business relationship with Costco, CREW met with Leonetti in Philadelphia at unknown times. (*Id.* at ¶

---

[1] Sam's Club is a national membership-based warehouse "club store."

29.) Leonetti never agreed, ether orally or in writing, to amend the Costco brokerage agreement to include the Sam's Club account. (*Id.* at ¶ 30.)

CREW's Jeff Campigli represented Leonetti on the Costco account. (*Id.* at ¶ 27.) On August 14, 2014, CREW orally agreed at an unknown location to (1) represent Leonetti in interfacing with Sam's Club's head office and food buyers regarding Leonetti Café Stromboli and Frozen Stromboli products; (2) assist Leonetti with preparing forms and other paperwork required by Sam's Club in pitching and presenting the Café Stromboli and Leonetti Frozen Stromboli products; (3) assist Leonetti in the handling of the sampling, cutting and other product testing necessary to obtain Sam's Club's approval for the purchase of Leonetti Café Stromboli and Leonetti Frozen Stromboli products; and (4) maintain Leonetti product specifications and Sam's Club's respective product requirements for the Café Stromboli and Frozen Stromboli products in confidence as is standard within the industry. (*Id.* at ¶ 32.)

CREW's Cindy Romines then represented Leonetti with Sam's Club. (*Id.* at ¶ 36.) From August 2014 through January 2015, Leonetti developed the Café Stromboli under Sam's Club's specifications. (*Id.* at ¶ 38.) Romines, along with other CREW staff, liaised with Sam's Club management and buying department regarding the status of Leonetti prototype Café Stromboli and Leonetti Frozen Stromboli products, in addition to presenting and cutting samples of Leonetti products for testing in Sam's Club's home office test kitchen and in-club testing. (*Id.* at ¶ 39.) By December 2014, Sam's Club and CREW confirmed the Café Stromboli and Leonetti Frozen Stromboli products had been progressing favorably through development and testing. (*Id.* at ¶ 40.)

On December 10, 2014, Sam's Club agreed to purchase Leonetti Frozen Stromboli subject to a final panel test in early January 2015. (*Id.* at ¶ 41.) Sam's Club initially considered

3

purchasing Leonetti Frozen Stromboli for sale at twenty-six (26) stores in New Jersey, Pennsylvania, Delaware, and New York in the First Quarter 2015; if Leonetti Frozen Stromboli sold well, Sam's Club intended to expand the program nationwide. (*Id.* at ¶¶ 42-43.) In early January 2015, Romines attended the final panel test of Leonetti Frozen Stromboli and told Leonetti the Frozen Stromboli tested beautifully per her conversation with the Sam's Club employee overseeing the panel's taste test. (*Id.* at ¶¶ 45-46). With the panel test complete, Sam's Club's appeared prepared to place orders for Leonetti Frozen Stromboli. (*Id.* at ¶ 47.)

On December 16, 2014, CREW's Romines told Leonetti it had passed all tests to date for the Café Stromboli and the only remaining test before Sam's Club moved forward is the "hold test." (*Id.* at ¶ 48.) CREW's Romines attended Sam's Club's "hold test" on January 14, 2015. (*Id.* at ¶ 51.) On the same day, Romines emailed her summary of the hold test to "John and Jeremy" of Sam's Club:

> John and Jeremy good day! I completed the in-club testing this morning at the Bentonville Sam's Club. Test went extremely well. I used 8 Stromboli's in the test. The additional samples were used to determine where to start the pans as the temperature and times were not set at 485* - 6 minutes. The ovens were set at 500* - 6:30, club associate said they started the pizzas at the entrance of the oven and recommended we do the same. I found that the top oven cooked hotter than the 2nd and 3rd oven. While the top oven did not burn the Stromboli they were a little darker than we like to have. Attached is a recap of the testing. Please let me know if you have any questions and what our next steps will be.

(*Id.* at ¶ 52.)

CREW's Romines copied Leonetti and her colleague Campigli on her January 14, 2015 email to "John and Jeremy" of Sam's Club. CREW's Campigli "replied all" to Romines' January 14, 2015 email:

> "Nice job Cindy. Robert and I could even use slides 2-5 in our Costco Presentation next week :)"

(*Id.* at ¶ 56.)

4

Leonetti claims "shock" to learn of Campigli's email sent to Sam's Club suggesting Leonetti would ever take part in using a confidential and proprietary stromboli developed for Sam's Club to sell to Costco, Sam's Club's largest competitor. (*Id.* at ¶ 57.)

The next day, Leonetti responded to CREW's Campigli and Romines: "Ouch Jeff...." (*Id.* at ¶ 59.) CREW's Campigli responded: "I am so sorry guys...writing email to John now." (*Id.* at ¶ 66.) CREW's Campigli immediately emailed John at Sam's Club:

> John, I AM SO SORRY. This was a very poor attempt at humor and meant for Cindy only. We would never share testing, conducted exclusively for you, with any customer...especially your #1 competitor.
> Cindy, Robert and Beth have worked so hard to meet your expectations. I can only hope that you won't hold this stupid, stupid error as a negative against a fantastic product and profitable program for Sam's Club.
>
> As the person responsible for the Costco account in our brokerage company, I'd like to assure you that the product Leonetti's has developed with you over the past several years is exclusive to Sam's. Any work we have been asked to do for Costco does not include this specific product.
>
> I'm traveling on Friday, but if you'd like to discuss this in further detail, please don't hesitate to contact me @ [REDACTED]

(*Id.* at ¶ 61.)

Sam's Club responded furiously to CREW's Campigli's email, did not believe him and now believed Leonetti to be an untrustworthy business partner. (*Id.* at ¶¶ 62-64.) Sam's Club concluded to not do business with Leonetti. (*Id.* at ¶ 65.) In late January 2015, Sam's Club advised it would not purchase any of Leonetti stromboli. (*Id.* at ¶ 67.) After learning of Sam's Club's decision, CREW's Romines called Leonetti and informed him the Café Stromboli passed the final test and Leonetti Frozen Stromboli performed exceptionally well at the focus group testing according to Sam's Club personnel present during the testing. (*Id.* at ¶¶ 68-69.) CREW's Romines said Campigli's email is the only possible reason for Sam's Club's decision. (*Id.* at ¶ 69.) Leonetti alleges CREW's Campigli's January 14, 2015 "reply- all" email is the sole

reason for Sam's Club decision not to move forward. (*Id.* at ¶ 70.) Having lost the Sam's Club opportunity, Leonetti sued CREW for damages alleging professional negligence; breach of an oral contract; breach of a fiduciary duty; and, trade libel.

## II. ANALYSIS

CREW moves to dismiss arguing this Court lacks personal jurisdiction or is otherwise an improper venue, and if we retain the case, Leonetti fails to state a claim. As we find transfer of this matter to the Western District of Arkansas is warranted, we decline to review CREW's arguments under Rules 12(b)(2) and 12(b)(6).[2]

### Transfer to the Western District of Arkansas is warranted under *Jumara*.

CREW removed this case from the Court of Common Pleas of Philadelphia County, Pennsylvania in this District. (*Id.*, ¶¶ 7, 9). Venue is presumptively proper here. "Section 1441(a) expressly provides that the proper venue of a removed action is 'the district court of the United States for the district and division embracing the place where such action is pending.'" *Polizzi v.*

---

[2] "Courts generally consider the question of personal jurisdiction before addressing the issue of proper venue." *Cumberland Truck Equip. Co. v. Detroit Diesel Corp.*, 401 F. Supp. 2d 415, 419 (E.D. Pa. 2005) (*citing Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979)). "A court may, however, first analyze the question of venue when "the resolution of the venue issue 'resolves' the case before [the] Court." *Cumberland*, 401 F. Supp. 2d at 419 (*citing Lomanno v. Black*, 285 F.Supp.2d 637, 640 (E.D.Pa.2003)).

"A court has the power to transfer a case pursuant to venue transfer statutes without possessing personal jurisdiction over the defendants." *Cumberland*, 401 F. Supp. 2d 415 at 419 (footnote omitted) (*citing Goldlawr, Inc., v. Heiman*, 369 U.S. 463, 466 (1962)). In *United States v. Berkowitz*, 328 F.2d 358 (3d Cir. 1964), the Court of Appeals for the Third Circuit held "[t]he district court believed that it was without power to transfer this case under § 1404(a) in the absence of jurisdiction over the person of the defendant. But *Goldlawr, Inc. v. Heiman*, [], conclusively settled that question. It is true that *Goldlawr* involved an interpretation of § 1406(a). Nevertheless, we think that its rationale applies equally to § 1404(a), for these are companion sections, remedial in nature, enacted at the same time, and both dealing with the expeditious transfer of an action from one district or division to another." 328 F.2d at 361 (*citing Goldlawr*, 369 U.S. 463 (1962)). Accordingly, we may transfer a case pursuant to § 1404(a) despite lacking personal jurisdiction over the persons. *Berkowitz*, 328 F.2d at 361.

*Cowles Magazines, Inc.*, 345 U.S. 663, 666 (1953) (*citing* 28 U.S.C § 1441). While Leonetti and Crew discuss the factors under 28 U.S.C § 1391, those factors are not relevant in a removed case.

Despite the presumptive propriety of venue, we may transfer this case after carefully applying the factors in *Jumara v. State Farm Ins. Co.* 55 F.3d 873, 879 (3d Cir. 1995). Pursuant to 28 U.S.C. §1404(a), a district court "[f]or the convenience of parties and witnesses, in the interest of justice, . . . may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties consented." "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (internal quotation omitted); *see also Jumara*, 55 F.3d at 879.

Section 1404(a) requires the alternate venue to be one in which the case "might have been brought." 28 U.S.C. §1404(a). CREW is an Arkansas corporation, retained by Leonetti to liaise with Sam's Club in the same town in Arkansas. A substantial part of the events giving rise to Leonetti claims occurred in the Western District of Arkansas, even though a Pennsylvania company experienced the harm of conduct emanating from California but not effected until a decision by Sam's Club in the Western District of Arkansas. As CREW is located in the Western District of Arkansas, general personal jurisdiction may be invoked over it there. This action could have been properly brought in the Western District of Arkansas. *See id.*

"In ruling on § 1404(a) motions, courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice)...." *Jumara*, 55 F.3d at 879. Beyond the three enumerated factors, courts consider private and public interest factors to determine whether to transfer venue. *Id.*

Leonetti focuses almost entirely on its harm felt in this District. We appreciate a Pennsylvania company's loss of a possible relationship allegedly caused by an unfortunate email sent by an Arkansas company to another Arkansas company. Leonetti focuses on this email and Sam's Club's reasons to not work with Leonetti. We cannot find authority, and will not find here, categorically mandating venue in this District when the only connection to this District is a Pennsylvania plaintiff seeking recovery for an errant email causing an Arkansas company to make a business decision to not work with the Pennsylvania company, particularly when there is no directed activity to harm the Pennsylvania citizen. Instead, we must apply *Jumara's* private and public interest factors in determining whether a transfer serves the convenience of the parties and witnesses and the interests of justice.

*Private interest factors.*

"The private interests have included: (1) plaintiffs forum preference as manifested in the original choice; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses - but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Jumara*, 55 F.3d at 879 (citations omitted).

Leonetti prefers its home forum in the Eastern District of Pennsylvania, CREW prefers its home forum in the Western District of Arkansas. "It is black letter law that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice 'should not be lightly disturbed.' " *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970) (citing *Ungrund v. Cunningham Brothers, Inc.*, 300 F.Supp. 270, 272 (S.D. Ill. 1969)).

The claim for breach of contract may arise in the Eastern District of Pennsylvania or the Western District of Arkansas. The breach occurred in an email sent from California to Arkansas and Pennsylvania. The breach, if any, is of CREW's oral agreement (admittedly not permitted under their written agreement) reached in an unknown location to represent Leonetti in the Western District of Arkansas.

The tort claims for professional negligence, breach of fiduciary duty, and trade libel weigh in favor of transfer, as they all arise outside of Pennsylvania. The convenience of the parties is neutral as one party will need to travel to the other forum regardless of which is selected. The convenience of witnesses appears neutral, although the Sam's Club representatives making the decisions and the CREW agents are located in, or work from, Arkansas. There is no basis to find any witness from either party is not available for a trial in Arkansas but third party witnesses from Sam's Club are located in the Western District of Arkansas. The location of books and records, particularly in this electronic age, is not dispositive as the records can be produced and transferred with ease from either venue. If anything, the key documents and emails involve Sam's Club's internal decision to not hire Leonetti. Those original records and their custodians, along with CREW's records, are headquartered in the Western District of Arkansas.

*Public interest factors.*

"The public interests have included: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." *Jumara,* 55 F.3d at 879-80

(citations omitted)).

A judgment rendered by the district court in Western Arkansas is as equally enforceable as a judgment from this District, although Leonetti's potential judgment in Arkansas may be procedurally easier to execute upon local company CREW rather than a transferred judgment from this District. We are not aware of any CREW assets in this District but Leonetti concedes CREW is located in the Western District of Arkansas. Practical considerations weigh in favor of transfer as all witnesses to Sam's Club's decision to cease discussions with Leonetti are located in Western Arkansas.

We are also mindful, while we do not rule upon personal jurisdiction here, Leonetti has a difficult argument to sustain specific personal jurisdiction over CREW for its professional negligence[3], breach of fiduciary duty[4] and trade libel [5]claims in Pennsylvania. Following

---

[3]  *See Poole v. Sasson*, 122 F. Supp. 2d 556, 558 (E.D. Pa. 2000) (personal jurisdiction could not be exercised in New Hampshire over Florida attorneys representing New Hampshire residents based on alleged negligence and malpractice where the harm was felt in New Hampshire but the negligent conduct occurred elsewhere); *See also FDIC v. Malmo*, 939 F.2d 535, 536–37 (8th Cir.1991) (effects of an attorney's negligence felt in the forum insufficient to establish personal jurisdiction).

[4]  Breach of fiduciary duty is an intentional tort, meeting the first element of the effects test of specific jurisdiction in *Calder v. Jones,* 465 U.S. 783 (1984). Leonetti felt the brunt of the harm in Pennsylvania, meeting the second *Calder* element. However, there is no indication CREW expressly aimed its conduct at Pennsylvania, and its alleged conduct breaching a fiduciary duty (the reply-all email) occurred outside Pennsylvania. "[T]he *Calder* "effects test" can only be satisfied if the plaintiff can point to contacts which demonstrate that the defendant *expressly aimed* its tortious conduct at the forum, and thereby made the forum the focal point of the tortious activity." *IMO Indus., Inc v. Kiekert AG*, 155 F.3d 254, 265 (3d Cir. 1998) (emphasis in original). "Simply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient in itself to meet this requirement." *Id.* (footnote omitted). "The defendant must 'manifest behavior intentionally targeted at and focused on' the forum for *Calder* to be satisfied." *Id. (citing ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997)). Without some indication CREW expressly aimed its "reply-all" email at Pennsylvania, it may be difficult for this Court to exercise personal jurisdiction over CREW on the breach of fiduciary duty claim.

analysis, it is likely this Court may only retain personal jurisdiction over Leonetti's breach of contract claim. Conversely, Leonetti is unlikely to face challenges to either general or specific personal jurisdiction over CREW in its home district; transferring the whole action to a single forum with unquestioned personal jurisdiction rather than requiring two trials on largely the same facts in two fora will make trial easier, more expeditious, and less expensive for all parties.[6]

Applying the remaining public interest factors, we find the factors are either neutral or weigh in favor of the Western District of Arkansas. The parties do not offer comparisons of case processing between this District and the Western District of Arkansas but, absent some extraordinary fact, we expect the fine jurists in the Western District of Arkansas who review cases involving Walmart matters will similarly move this matter to prompt resolution. The interest in resolving local controversies at home may weigh in favor of retaining venue if the

---

[5] Trade libel is an intentional tort. *See George A. Davis, Inc. v. Camp Trails Co.*, 447 F. Supp. 1304, 1306 (E.D. Pa. 1978). Similar to our analysis of breach of fiduciary duty, trade libel meets elements one and two of *Calder*. Leonetti adduces no basis to find CREW expressly aimed conduct at Pennsylvania; while CREW sent the email here through a "reply-all", the named recipient of the email is Cindy Romines, a CREW employee. (ECF Doc. No. 8 at 8). While the conduct reached Pennsylvania, it appears to be aimed at Arkansas. "Simply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient in itself to meet this requirement." *IMO Indus.*, 155 F.3d at 265 (footnote omitted). "The defendant must 'manifest behavior intentionally targeted at and focused on' the forum for *Calder* to be satisfied." *Id.* (citing *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997)). Without some indication CREW expressly aimed its reply-all email at Pennsylvania, it may be difficult for this Court to exercise personal jurisdiction over CREW on the trade libel claim.

[6] Even if denied transfer under § 1404(a), conducted a personal jurisdiction analysis, and found no personal jurisdiction over CREW for three of Leonetti's four claims, we would likely transfer to the Western District of Arkansas under 28 U.S.C. § 1631. Under this procedure, "[a] court may transfer a case to another district in which the action could have been brought, even when it lacks personal jurisdiction over the defendants." *Manley v. Premium Spray Prods., Inc.*, No. 14-3379, 2015 WL 1475310, *5 (E.D. Pa. Mar. 31, 2015) (citing *Goldlawr*, 369 U.S. at 465-67).

majority of witnesses were not located in Arkansas. Here, the controversy only affected a Pennsylvania citizen. All facts and witnesses relating to the errant "reply-all" email, and its alleged harmful affect upon Sam's Club, are local in the Western District of Arkansas. We find the public policies of both Pennsylvania and Arkansas recognize the impact of mistaken "reply-all" emails and their effect upon an innocent party. We also find the district judge in either state can apply the applicable law of either Arkansas or Pennsylvania and this factor is also neutral.

### III. CONCLUSION

Taken as a whole, the *Jumara* private and public interest factors weigh in favor of transferring venue to the Western District of Arkansas. While Leonetti's choice of venue is not lightly disturbed particularly given it felt the effects of CREW's actions here, we find all of the remaining *Jumara* factors relating to the convenience and location of witnesses relating to Sam's Club's decision based on CREW's representation arise in, and are more directly related to, the Western District of Arkansas. We transfer venue to the Western District of Arkansas in the accompanying Order.